## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| **ALANNA WATKINS**, <br><br> Plaintiff, <br><br> v. <br><br> **WASHINGTON METROPOLITAN AREA TRANSIT AUTHORITY**, <br><br> Defendant. | Civil Action No. 13-cv-963 (TSC) <br> No. 19-cv-3478 (TSC) |

### MEMORANDUM OPINION

Plaintiff Alanna Watkins sued the Washington Metropolitan Area Transit Authority ("WMATA") under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.*, and the Civil Rights Act of 1991, 42 U.S.C § 1981a, for gender discrimination, retaliation based on gender and prior protected Equal Employment Opportunity ("EEO") activity, hostile work environment based on gender, and constructive discharge. The court granted Defendant's motion to dismiss Plaintiff's hostile work environment based on retaliation and constructive discharge claims. *Watkins v. Wash. Metro. Area Transit Auth.*, No. 19-cv-03478, 2023 WL 2734324 (D.D.C. Mar. 31, 2023). Defendant now seeks summary judgment on the remaining claims. Def.'s Mot. for Summ. J., ECF No. 48-1 ("Def.'s MSJ"). For the reasons set forth below, Defendant's motion will be GRANTED.

### I.    BACKGROUND

#### A.  Factual Background

The court summarizes the facts developed through discovery, as reflected in the parties' statements of undisputed material facts and supporting evidence. *See generally* Def.'s Statements

of Undisputed Material Facts, ECF No. 48-9 ("Def.'s SOF"); Pl's Opp'n to Def.'s MSJ at 1–16, ECF No. 50 ("Pl.'s Opp'n"); Pl.'s Resp. to Def.'s SOF, ECF No. 50-2 ("Pl.'s SOF Resp."); Def.'s Suppl. Statement of Undisputed Material Facts, ECF No. 52-1 ("Def.'s Suppl. SOF").

   i.   **Plaintiff's Employment and MTPD Operations**

Plaintiff joined Defendant's Metro Transit Police Department ("MTPD") in 1999 as a patrol officer. Pl.'s SOF Resp. ¶ 28. She served as a Detective in MTPD's Criminal Investigation Division ("CID") starting in 2009 until her resignation on March 27, 2014. *Id.* ¶ 30. CID investigates "a mix of crimes against persons, property, or both" with "a force of about 20 detectives." *Id.* ¶¶ 5, 8. Lieutenant Greg Hannah commanded CID until May 13, 2012, at which time Lieutenant Stephen Boehm assumed command for the duration of Plaintiff's employment. *Id.* ¶ 6. Plaintiff's "first-line supervisors" included Sergeants Donahue, Kirkpatrick, Muller, Clayton, Flinn, and Page. *Id.* ¶ 7; Pl.'s Opp'n ¶¶ 6–9.

MTPD's General Orders establish the department's policies and procedures. Pl.'s SOF Resp. ¶¶ 15–24. MTPD's Office of Professional Responsibility and Inspections ("OPRI") or line supervisors investigate complaints or allegations that an officer violated the General Orders. *See id.* ¶ 25; Decl. of Daniel Alvarez – Ex. 9 at 2, ECF No. 48-6. If the investigation reveals that a violation occurred, supervisors must notify the division commander and obtain approval for any disciplinary action, such as a written "dereliction" or an unpaid suspension. Pl.'s SOF Resp. ¶ 15; Alvarez Decl. – Ex. 9 at 2, 5–6. Defendant's Office of Civil Rights ("OCR"), now the Office of Equal Employment Opportunity ("OEEO"), receives and responds to charges filed against Defendant through the U.S. Equal Employment Opportunity Commission ("EEOC"). Pl.'s SOF Resp. ¶ 110. From 2012 to 2014, if a current or former MTPD employee filed an EEOC charge, OEEO notified the MTPD Chief and requested records or information as needed. *Id.* ¶¶ 111–12. Other MTPD officials would be informed on "a need-to-know basis." *Id.*

ii.   **April 2012 Complaint against Sergeant Muller**

On April 18, 2012, Plaintiff sent Lieutenant Hannah an email with a "potential EEOC complaint," stating that in "October or November of 2011" Sergeant Muller referred to her and another female detective as "bitches." Def.'s Ex. 2 – Dep. of Alanna Watkins Ex. P-1 at 2, ECF No. 48-2 ("Def.'s Watkins Dep. – Ex. P-1"). Following a separate anonymous complaint made around the same time, Defendant's OPRI and Office of Inspector General ("OIG") investigated misconduct within CID, including whether officers used their service weapons in "horse play," left work early or used their vehicle for personal transportation, and whether "on several occasions Sgt. Matthew Muller referred to the female detectives as 'bitches.'" Alvarez Decl. – Ex. 11 at 1, ECF No. 48-6. Plaintiff did not submit the anonymous complaint. Def.'s Ex. 2 – Dep. of Alanna Watkins 67:12–68:04, ECF No. 48-2 ("Def.'s Watkins Dep."). Between April and June 2012, OPRI and OIG interviewed all twenty-two CID members, including Plaintiff. Pl.'s SOF Resp. ¶ 33. Plaintiff's interview occurred on May 23, 2012, and she sent an email synopsis of the interview to OIG and OPRI the same day. Def.'s Watkins Dep. – Ex. P-1 at 3. During the interview, Plaintiff reported that Sergeant Muller had called female detectives "bitches," that Muller gave preferential treatment to certain detectives, that CID failed to address complaints, and that she had filed an EEOC complaint. *Id.* at 3–4.[1] Although she did not mention it in her April 2012 email or interview, Plaintiff testified at her deposition that Sergeant Muller also asked "whether she was leaving for 'sexy time or shopping' on numerous occasions" when she requested leave and would regularly deny her leave or overtime requests. Pl.'s Opp'n ¶¶ 14–19.

---

[1] Despite Plaintiff's reference to an EEOC complaint in May 2012, the parties agree that Plaintiff filed her First EEOC Charge on August 13, 2012. Pl.'s SOF Resp. ¶ 113; Pl.'s Opp'n at 23–24

On May 13, 2012, while the internal investigation was ongoing, Muller transferred out of CID.  Pl.'s SOF Resp. ¶ 37.  On July 25, 2012, OPRI and OIG issued an investigation memorandum concluding that "there was no substantiating evidence or eyewitness account to prove the allegations" about Muller.  Alvarez Decl. – Ex. 11 at 2.

At some point, Plaintiff "heard chatter in the office that it was confirmed that [she] filed an EEO complaint" about Muller and that officers thought she prompted the broader internal investigation.  Pl.'s Ex. 2 – Dep. of Alanna Watkins 203:11–20, ECF No. 50-4 (Pl.'s Watkins Dep.).  She testified in her deposition that detectives made "indirect threats of violence," that she wouldn't "get back up" or it "would be horrible if somebody Swiss cheesed [Plaintiff], as in shoot in full, fill with bullet holes."  Pl.'s Watkins Dep. at 205:19–206:01.  Plaintiff does not specify who made any of these comments or when they occurred.

### iii.  First EEOC Charge

On August 13, 2012, Plaintiff filed her first EEOC charge against Defendant, claiming discrimination based on sex because Sergeant Muller called her and another female detective "'bitches' on more than one occasion."  Decl. of Jan Bryant – Ex. 1, ECF No. 48-3 ("Def.'s First EEOC Charge"); Pl.'s Ex. 5 at 1–2, ECF No. 50-7 ("Pl.'s First EEOC Charge").  Defendant received the EEOC charge on or "about September 6, 2012."  Def.'s SOF ¶ 113.  On February 5, 2013, Plaintiff amended the charge to include hostile work environment based on sex.  Bryant Decl. – Ex. 2 at 2, ECF No. 48-3 ("Def.'s Amended First EEOC Charge"); Pl.'s Ex. 5 at 3–4, ECF No. 50-7 ("Pl.'s Amended First EEOC Charge").  The amendment added that Muller "regularly treated [her] differently than he did [her] then-partner" and other male detectives.  Def.'s Amended First EEOC Charge at 3.  Defendant received the amendment on February 27, 2013.  *Id.* at 1.

iv.    **October 2012 Dereliction and December 2012 Corrective Action Plan**

Plaintiff contends that Defendant started retaliating against her after she filed her First EEOC Charge.  First, on October 11, 2012, approximately two months after Plaintiff filed her First EEOC Charge, she received a dereliction for failing to efficiently investigate her assigned cases (the "October 2012 Dereliction").  Boehm Decl. – Ex. 3, ECF No. 48-8.  On October 4, 2012, Lieutenant Boehm instructed Plaintiff to complete her outstanding Variance 9 investigations by October 11.  *Id.*; *see also* Pl.'s SOF Resp. ¶ 60.  When Plaintiff failed to do so, she received a written dereliction for failing "to perform her duties in an efficient manner."  Boehm Decl. – Ex. 3.  Lieutenant Boehm also instructed Sergeant Clayton to prepare a Corrective Action Plan ("CAP") to address Plaintiff's handling of the Variance 9 cases.  Pl.'s SOF Resp. ¶ 66.  Plaintiff had never before received a dereliction.  Pl.'s Opp'n ¶ 93.  On October 17, 2012, Plaintiff took leave under the Family Medical Leave Act ("FMLA").  *Id.* ¶ 80; Def.'s Watkins Dep. – Ex. 10, ECF No. 48-2.  She returned on December 12, 2012, Def.'s Watkins Dep. – Ex. 10, and was immediately placed on a CAP for the Variance 9 cases (the "December 2012 CAP"), Pl.'s SOF Resp. ¶ 68.  No other CID detectives received a CAP from Sergeant Clayton from 2012 to 2014.  Pl.'s Opp'n ¶ 74; Pl's Ex. 4 at 6, ECF No. 50-6.

v.    **2012 Pay Grade Change**

MTPD requires officers to maintain a sick leave balance of 312 hours to be eligible for the "Police Officer 3" ("PO3") pay grade and 156 hours for the "Police Officer 2" ("PO2") pay grade, and periodically conducts sick leave audits to verify compliance.  *See* Pl.'s SOF Resp. ¶ 44; Pl.'s Opp'n ¶¶ 59, 80.  On November 5, 2012, MTPD Chief Michael Taborn sent Plaintiff a memorandum informing her that her pay grade would be adjusted from PO3 to PO2 within the next thirty days because her current sick leave balance—243.25 hours—failed to meet the PO3 criteria.  Alvarez Decl. – Ex. 17, ECF No. 48-6.  MTPD changed Plaintiff and fifteen other officers

from PO3 to PO2 effective December 2, 2012 (the "2012 Pay Grade Change"). Alvarez Decl. –
Ex. 18, ECF No. 48-6; Def.'s SOF ¶ 52.

### vi.    Second EEOC Charge

Plaintiff filed a second EEOC charge sometime in April or May 2013 ("Second EEOC
Charge"). Pl.'s SOF Resp. ¶ 115; Pl.'s Opp'n – Ex. 5 at 8–10, ECF No. 50-7 ("Pl.'s Second EEOC
Charge"); Bryant Decl. – Ex. 3, ECF No. 48-3 ("Def.'s Second EEOC Charge"). The Second
EEOC Charge alleges retaliation and a hostile work environment because Defendant changed
Plaintiff's pay grade and imposed a dereliction and CAP after Plaintiff filed her First EEOC
Charge. Def.'s Second EEOC Charge at 3. The Second EEOC Charge's exact date and content
is unclear because the parties provided multiple, inconsistent copies of the charge, each bearing
the same tracking number (EEOC Charge No. 531-2013-00814). Defendant's copy is unsigned
and undated but attached to an EEOC charge notice dated July 3, 2013. *Id.* at 1–3. Plaintiff
provides two copies, one dated April 1, 2013 and another dated May 28, 2013, and an undated
attachment with additional factual allegations. Pl.'s Second EEOC Charge at 8–10.

### vii.    2013 Derelictions, Case Reassignments, and Work Authorization Revocation

On May 14, 2013, Plaintiff received a dereliction for failing to respond immediately to
radio calls for assistance on April 10, 2013 ("May 2013 Failure to Respond Dereliction"). Pl.'s
SOF Resp. ¶¶ 70–71. Plaintiff claims she was attending the midnight roll call and did not hear the
radio calls. *Id.* ¶ 71. The dereliction investigation report found three violations of MTPD's General
Orders—failure to respond to a call for service, failure to conduct a preliminary investigation, and
failure to mark herself out with Communications. *Id.* ¶ 72. On May 16, 2013, Plaintiff received
a dereliction from Sergeant Moye at the Cheltenham, Maryland shooting range for arriving thirty
minutes late to an annual handgun qualification training ("May 2013 Tardy Dereliction"). *Id.* ¶ 75.
Because Plaintiff incurred three derelictions from October 2012 to May 2013, she received a lower

score in the "Judgment" category on her 2012–2013 annual performance evaluation ("2013 Performance Evaluation"). *Id.* ¶ 79. As a result, her overall score dropped from 6.65 in 2011–2012 to 5.4 in 2012–2013, which remained in the "Acceptable" range. *Id.* ¶¶ 78, 80.

In June 2013, Sergeants Page and Clayton reassigned some of Plaintiff's cases, including cases that permitted overtime, to other CID officers. Pl.'s Opp'n ¶¶ 105–13; Pl.'s Ex. 3 – Dep. of Daniel Alvarez at 116:08–15, ECF 50-5 ("Alvarez Dep."). Detective Alvarez stated in his deposition that it was "common in CID to have cases reassigned," but he did not know if Plaintiff's coworkers had cases reassigned. Alvarez Dep. at 116:08–15. Plaintiff stated in her deposition that another detective's Variance 9 cases were reassigned to her at some point. Pl.'s Watkins Dep. at 129:07–20 ("[H]e and I were assigned some of the Variance 9 and then they were eventually moved to me.").

On September 12, 2013, Lieutenant Boehm revoked Plaintiff's outside employment authorization. Boehm Decl. – Ex. 6 at 1, ECF No. 48-8. MTPD General Order 245 requires officers to maintain 100 hours of sick leave to be eligible for outside employment. Pl.'s SOF Resp. ¶ 82. Although Chief Pavlin initially approved Plaintiff's request for outside employment authorization on June 20, 2013, when her sick leave balance was thirty-two hours, Boehm Decl. – Ex. 6 at 1, Lieutenant Boehm subsequently revoked the authorization based on her sick leave balance of twenty-six hours, the May 2013 Tardy Dereliction, and her low "Judgment" score in the 2013 Performance Evaluation. *Id.*

Plaintiff received her fourth dereliction in November 2013 for failing to notify an official that she intended to return from sick leave at least one hour before her next scheduled shift ("November 2013 Dereliction"). Pl.'s SOF Resp. ¶ 89.

viii.    **Second Amended EEOC Charge**

Plaintiff amended her Second EEOC Charge on January 2, 2014, to include the May and November 2013 derelictions, the 2013 Performance Evaluation, revocation of her outside employment authorization, and the case reassignments. Pl.'s Opp'n – Ex. 5 EEOC Charges at 11–12, ECF No. 50-7 ("Pl.'s Amended Second EEOC Charge"). Defendant has no record of this amendment, Pl.'s SOF Resp. ¶ 117, but Plaintiff provided a copy of the amendment with a received stamp on its face. *See* Pl.'s Amended Second EEOC Charge.

ix.    **March 2014 Suspension and Resignation**

On March 6, 2014, Plaintiff received a dereliction and three-day suspension for failure to contact a complainant within forty-eight hours of receiving a case, failure to obey a direct order, and failure to complete a Report of Investigation ("ROI") within one week of receiving a case ("March 2014 Dereliction and Suspension"). Pl.'s SOF Resp. ¶¶ 92, 98–99; *see also* Pl.'s Ex. 19, ECF No. 50-21. Sergeant Flinn assigned Plaintiff a theft complaint case on January 20, 2014. Boehm Decl. – Ex. 8 at 1, ECF No. 48-8. On February 4, the complainant contacted Sergeant Page because he had not received a call from Plaintiff, despite attempting to contact her multiple times and leaving voicemails. *Id.* As a result, Sergeant Page reassigned the case to another detective, notified Lieutenant Boehm, and asked Plaintiff to provide her ROI immediately. *Id.* at 1–2. Plaintiff failed to do so and, after Boehm followed up, she stated that she did not have a case file or ROI. *Id.* at 2–3. Chief Pavlik issued a three-day unpaid suspension from March 17 to 19. Pl.'s Opp'n – Ex. 19, ECF No. 50-21. Plaintiff resigned from MTPD on March 27, 2014. Pl.'s SOF Resp. ¶ 30. After her resignation, MTPD dismissed the investigation stemming from the March 2014 Dereliction and Suspension as "unfounded." Pl.'s Opp'n – Ex. 22, ECF No. 50-24.

x.    **Third EEOC Charge**

After resigning, Plaintiff filed a third EEOC charge against Defendant on May 29, 2014, claiming retaliation and a hostile work environment in retaliation for her prior EEOC activity based on the March 2014 suspensions.  Bryant Decl. – Ex. 4 ("Def.'s Third EEOC Charge").

**B.  Procedural Background**

This matter involves two consolidated cases.  Plaintiff filed a Complaint against Defendant on June 25, 2013, asserting claims for gender discrimination, hostile work environment based on gender and protected EEOC activity, and retaliation.  Compl., ECF No. 1, No. 13-cv-963 ("*Watkins I*").  The court stayed that case during EEOC proceedings arising out of Plaintiff's Second and Third EEOC Charges, and ordered the parties to file joint status reports every ninety days and to promptly notify the court when the EEOC proceedings concluded, which they failed to do.  Oct. 28, 2014, Min. Order, No. 13-cv-963; *Watkins*, 2023 WL 2734324, at *3.  Instead, on November 18, 2019, Watkins filed a second lawsuit, asserting claims for hostile work environment based on gender and protected EEOC activity, retaliation, and constructive discharge.  Compl., ECF No. 1, No. 19-cv-3478; Am. Compl., ECF No. 23, No. 19-cv-3478.  In July 2020, the court consolidated the cases.  July 9, 2020 Min. Order, No. 19-cv-3478.  The court denied Defendant's motion to dismiss Plaintiff's gender discrimination, hostile work environment based on gender, and retaliation claims, *Watkins*, 2023 WL 2734324, at *10, and Defendant now seeks summary judgment on those claims.[2]

---

[2] The court dismissed the *Watkins I* retaliation and hostile work environment based on retaliation claims for failure to timely exhaust administrative remedies, dismissed the *Watkins II* hostile work environment claim based on retaliation because Plaintiff failed to allege sufficiently severe and pervasive conduct, and dismissed the *Watkins II* constructive discharge claim because she failed to allege sufficient facts showing an intolerable working environment that would cause any reasonable person to conclude resignation was the only reasonable recourse.  *Watkins*, 2023 WL 273424, at *5–10.

## II.    LEGAL STANDARD

Summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Waterhouse v. District of Columbia*, 298 F.3d 989, 991 (D.C. Cir. 2002).  A factual dispute is "material" if the facts involved "might affect the outcome of the suit under the governing law."  *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986).  A dispute is "genuine" if there is enough evidence for a reasonable jury to return a verdict for the non-movant.  *See Scott v. Harris*, 550 U.S. 372, 380 (2007).  Courts "must view all facts, and draw all reasonable inferences, in the light most favorable to the party opposing the motion."  *Lane v. District of Columbia*, 887 F.3d 480, 487 (D.C. Cir. 2018) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986)).  If the evidence favoring the non-moving party is "merely colorable, or is not significantly probative, summary judgment may be granted."  *Anderson*, 477 U.S. at 249–50 (citations omitted).  The court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *Id*. at 251–52.

## III.    ANALYSIS

### A.  Deputy Chief Alvarez's Deposition and Declaration

Plaintiff urges the court not to consider Deputy Chief Alvarez's declaration, submitted by Defendant in support of their motion, pursuant to the "sham-affidavit rule."  Pl.'s Opp'n at 18–19; Alvarez Decl., ECF No. 48-5.  The sham-affidavit rule "precludes a party from creating an issue of material fact by contradicting prior sworn testimony unless the 'shifting party can offer persuasive reasons for believing the supposed correction' is more accurate than the prior testimony."  *Galvin v. Eli Lilly & Co.*, 488 F.3d 1026, 1030 (D.C. Cir. 2007) (citation omitted). Defendant, as the movant, has no reason to create an issue of material fact, which would preclude

summary judgment.  Fed. R. Civ. P. 56(a).  Nonetheless, Plaintiff contends that the declaration contradicts Alvarez's earlier deposition testimony as Defendant's Rule 30(b)(6) witness.  After examining the issues identified by Plaintiff, the court finds the declaration "does not contradict but instead clarifies the prior sworn statement," which "is usually considered admissible."  *Galvin*, 488 F.3d at 1030.  For instance, Plaintiff claims that Alvarez testified that "no other similarly situated detectives at WMATA had their cases reassigned" during the relevant time period, but that his declaration states "he often reassigned cases to other detectives . . . between 2012-2014."  Pl.'s Opp'n at 19.  This misrepresents Alvarez's deposition testimony, in which he testified that "it is common in CID to have cases reassigned" but he was not specifically aware if Plaintiff's coworkers had cases reassigned.  Alvarez Dep. at 116:08–14.  His declaration that "it was not unusual in 2012-2014, and it is not unusual today, for cases assigned to one detective in CID to be reassigned to another detective" is fully consistent with that testimony.  Alvarez Decl. ¶ 15.  Therefore, Alvarez's sworn declaration is appropriately part of the summary judgment record.

## B.  <u>Disparate Treatment under Title VII</u>

### i.  **Exhaustion**

Defendant first argues that it is entitled to summary judgment on Plaintiff's Title VII disparate treatment claim because she failed to timely exhaust any discrete acts of discrimination.  Def.'s MSJ at 6.  "Title VII requires that a person complaining of a violation file an administrative charge with the EEOC" before filing suit.  *Park v. Howard Univ.*, 71 F.3d 904, 907 (D.C. Cir. 1995); *see also Haynes v. D.C. Water & Sewer Auth.*, 924 F.3d 519, 526 (D.C. Cir. 2019).  Timely filing a charge of discrimination with the EEOC is not a jurisdictional requirement, but a claim-processing rule "subject to waiver, estoppel, and equitable tolling."  *Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385, 393 (1982).  A plaintiff generally must file the charge within 180 days of the alleged unlawful employment practice.  42 U.S.C. § 2000e-5(e)(1).  For a disparate treatment

charge, the unlawful employment practice occurs on the date of the discrete act of discrimination.

*Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 109–10 (2002).  As the Supreme Court

explained in *Morgan*,

> Each discrete discriminatory act starts a new clock for filing charges alleging that
> act.  The charge, therefore, must be filed within the 180– or 300–day time period
> after the discrete discriminatory act occurred.  The existence of past acts and the
> employee's prior knowledge of their occurrence, however, does not bar employees
> from filing charges about related discrete acts so long as the acts are independently
> discriminatory and charges addressing those acts are themselves timely filed.  Nor
> does the statute bar an employee from using the prior acts as background evidence
> in support of a timely claim.

*Id.* at 113.

Prior to *Morgan*, the D.C. Circuit developed a test to determine whether a plaintiff's claims

"were actually part of the administrative charge" for exhaustion purposes.  In *Park v. Howard*

*University*, 71 F.3d 904 (D.C. Cir. 1995), the Circuit held that plaintiffs may bring claims "like or

reasonably related to the allegations of the charge and growing out of such allegations."  *Haynes*,

924 F.3d at 526 (quoting *Park*, 71 F.3d at 907).  The claim "must at a minimum arise from the

administrative investigation that can reasonably be expected to follow the charge of

discrimination."  *Id.* (quoting *Payne v. Salazar*, 619 F.3d 56, 65 (D.C. Cir. 2010)) (cleaned up).

The Circuit has thrice "reserved the question whether *Park* survives *Morgan*."  *Webster v. Del*

*Toro*, 49 F.4th 562, 568 (D.C. Cir. 2022).  Without clear guidance from the D.C. Circuit, the court

agrees with the other courts in this district that "have held that plaintiffs alleging discrete acts of

discrimination or retaliation 'must exhaust the administrative process regardless of any

relationship that may exist between those discrete claims and any others.'"  *Rashad v. Was. Metro*

*Area Transit Auth.*, 945 F. Supp. 2d 152, 166 (D.D.C. 2013) (quoting *Coleman-Adebayo v. Leavitt*,

326 F. Supp. 2d 132, 137–38 (D.D.C. 2004), and collecting cases).  Although a plaintiff "is not

forever bound by the precise manner in which she framed her administrative complaint," she must

"identify the alleged incident of discrimination in a manner sufficient to put the agency on notice of the alleged wrongdoing." *Bain v. Off. of Att'y Gen.*, 648 F. Supp. 3d 19, 49 (D.D.C. 2022). A plaintiff "cannot bring any claims in this case based on conduct that she failed to identify in her EEO complaint." *Id.*; *Webster*, 49 F.4th at 567 ("[A] 'charge' alleging one 'unlawful employment practice' does not permit the employee to challenge others.").

Viewing the facts in the light most favorable to Plaintiff, there are no material disputed facts regarding exhaustion. The question for the court is the scope of Plaintiff's disparate treatment claim. "[T]he scope of the administrative complaint determines the scope of exhaustion and, hence, the claims that the employee may eventually pursue in federal court." *Bain*, 648 F. Supp. 3d at 44. The parties here have polar opposite interpretations. Defendant argues that Plaintiff exhausted only her disparate treatment claim as to discrete acts of discrimination by Sergeant Muller occurring on or after February 14, 2012, and before May 13, 2012, when Muller departed CID. Def.'s MSJ at 6. Plaintiff contends that Defendant's arguments are barred under *res judicata* and, alternatively, that she exhausted her claims regarding all conduct by Sergeant Muller and any other individuals from 2011 through 2014 because her First Amended EEOC Complaint stated the discrimination was a "continuing action." Pl.'s Opp'n at 20–21, 23–27.

Plaintiff filed her First EEOC Charge on August 13, 2012 and amended that charge on February 5, 2013, Pl.'s SOF Resp. ¶ 113, so any discrete discriminatory act exhausted by that charge must have occurred on or after February 15, 2012. The only discrete discriminatory act identified in the original or amended charge is Sergeant Muller's use of derogatory language. *See* Def.'s First EEOC Charge at 2; Def.'s Amended First EEOC Charge at 2. Plaintiff did not include any other specific discriminatory acts by Muller, such as the denials of overtime or leave requests, or any acts by any other individuals. *See id.* Because Plaintiff "did not provide the [EEOC] 'with

notice to investigate these possible grounds of discrimination,' . . . any [] claim based on them is unexhausted." *Foxworth v. McDonough*, 712 F. Supp. 3d 1, 8 (D.D.C. 2024); *see, e.g.*, *Crawford v. Duke*, 867 F.3d 103, 109 (D.C. Cir. 2017) (Plaintiff "adequately exhausted his claims" arising out of an October 2011 performance evaluation and a December 2011 suspension, but "did not ... properly exhaust his claimed denial of a promotion" in November 2011); *Bain*, 648 F. Supp. 3d at 49 ("Although these latter four alleged incidents occurred after Bain filed her EEO complaint, that did not relieve her of the exhaustion requirement."); *Dudley v. Wash. Metro. Area Transit Auth.*, 924 F. Supp. 2d 141, 155 (D.D.C. 2013) (Plaintiff failed to exhaust all "instances of discrimination . . . after [Plaintiff] filed his EEOC Charge."); *Folston v. Yellen*, 630 F. Supp. 3d 47, 57 (D.D.C. 2022) (Plaintiff failed to exhaust incidents that occurred after the EEO investigation concluded).

Plaintiff's attempts to circumvent the administrative exhaustion requirements are unpersuasive. *Res judicata* has no application here—there is no final, valid judgment in a prior litigation on the merits of a claim or issue raised here. *See Smalls v. United States*, 471 F.3d 186, 192 (D.C. Cir. 2006); *Taylor v. Sturgell*, 553 U.S. 880, 892 (2008). Plaintiff may be referring to the law of the case, which provides that "courts may not revisit issues already decided 'explicitly or by necessary implication' in the same case." *De Csepel v. Republic of Hungary*, 27 F.4th 736, 746 (D.C. Cir. 2022) (citation omitted). But even under this doctrine, Plaintiff misrepresents the court's prior ruling. She claims the court's Opinion resolving Defendant's motion to dismiss reached "a final and valid judgment on the merits of Defendant's timeliness and exhaustion arguments." Pl.'s Opp'n at 21. To the contrary, the court did not address exhaustion of Plaintiff's disparate treatment claim and declined to "consider whether [Plaintiff] timely exhausted her administrative remedies" for her sexual harassment claims "at th[at] juncture." *Watkins*, 2023 WL 2734324, at *5. Resolving Defendant's exhaustion arguments on certain claims does not constitute

a decision on all timeliness and exhaustion arguments. *See De Cespel*, 27 F.4th at 746 (ruling permitting amendment to complaint "in one respect did not preclude [plaintiff] from amending it in other respects" under law of the case doctrine); *Ferring Pharms., Inc. v. Azar*, 296 F. Supp. 3d 166, 176 (D.D.C. 2018) ("[Q]uestions that merely could have been decided do not become law of the case." (quoting *Women's Equity Action League v. Cavazos*, 906 F.2d 751 n.14 (D.C. Cir. 1990))).  Courts regularly resolve exhaustion at the summary judgment stage. *See, e.g.*, *Ferguson v. Wash. Metro. Area Transit Auth.*, 630 F. Supp. 3d 96, 110–11 (D.D.C. 2022); *Dudley*, 924 F. Supp. 2d at 153–54, 155–58 (D.D.C. 2013); *Bell v. Donley*, 724 F. Supp. 2d 1, 7–8 (D.D.C. 2010). Defendant also preserved exhaustion as an affirmative defense by asserting it as such in its Answer. Answer at 3, ECF No. 4, No. 13-cv-963.

Alternatively, Plaintiff urges an expansive reading of her EEOC charges, but the court "cannot allow liberal interpretation of an administrative [complaint] to permit a litigant to bypass the . . . administrative process." *Park*, 71 F.3d at 907.  Neither the continuing violation checked box nor the general assertion that Sergeant Muller treated her differently and her chain of command failed to respond provide sufficient notice of discrete acts of discrimination. *See Webster*, 49 F.4th at 567 (EEOC "'charge' must include the 'date, place and circumstances of the alleged unlawful employment practice'" (quoting 42 U.S.C. § 2000e-5(b))); *Youseff v. Holder*, 881 F. Supp. 2d 93, 102 (D.D.C. 2012) ("'[S]weeping and non-specific statement" likely would fail to exhaust administrative remedies under Title VII).  Plaintiff cannot rely on her subsequent EEOC retaliation claims to exhaust her gender discrimination claims.  "[A] long line of cases prohibits plaintiffs from 'conflating ideologically distinct categories of discrimination for purposes of meeting their exhaustion requirements.'"  *Bell*, 724 F. Supp. 2d at 9 (collecting cases).

Consequently, Plaintiff solely exhausted her discrimination claim based on Sergeant Muller's use of derogatory language between February 14 and May 13, 2012, when he transferred out of CID. The court will grant Defendant's motion for summary judgment as to Plaintiff's other unexhausted gender discrimination claims.

ii. **Merits**

Title VII prohibits employers from discriminating against an employee based on, among other things, gender. 42 U.S.C. § 2000e-2(a)(1). Although Title VII claims are typically analyzed under the familiar *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) burden-shifting framework, *Gaujacq v. EDF, Inc.*, 601 F.3d 565, 576 (D.C. Cir. 2010), Defendant forgoes that path and argues that Plaintiff cannot establish a *prima facie* case of discrimination. MTD at 6–7. In disparate treatment cases, the plaintiff must show that: (1) she belongs to a protected class, (2) she experienced an adverse employment action, and (3) the adverse employment action yields an inference of discrimination. *George v. Leavitt*, 407 F.3d 405, 412 (D.C. Cir. 2005). Defendant contends that Sergeant Muller's derogatory language towards Plaintiff is not an adverse employment action.

As the Supreme Court recently clarified, adverse employment actions include any "'disadvantageous' change in an employment term or condition." *Muldrow v. City of St. Louis*, 601 U.S. 346, 354 (2024) (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998)). Terms or conditions "is not used 'in the narrow contractual sense'; it covers more than the 'economic or tangible.'" *Id.* (quoting *Oncale*, 523 U.S. at 78). "[N]ot everything that happens at the workplace affects an employee's 'terms, conditions, or privileges of employment.'" *Chambers v. District of Columbia*, 35 F.4th 870, 874 (D.C. Cir. 2022). Typically, derogatory language is considered as direct evidence of discriminatory intent for a separate adverse employment action. *See Ayissi-Etoh v. Fannie Mae*, 712 F.3d 572, 577 (D.C. Cir. 2013)

(describing direct evidence of discriminatory intent as a "statement that itself shows racial or gender bias in the employment decision" (cleaned up)).  Absent any "'disadvantageous' change in an employment term or condition," *Muldrow*, 144 S.Ct. at 974, sporadic derogatory language or insults do not alone constitute an adverse employment action.  *See Jones v. D.C. Dep't of Corr.*, 429 F.3d 276, 280 (D.C. Cir. 2005) ("[A]n isolated insult [] does not constitute the sort of adverse action that can support a retaliation claim."); *Holcomb v. Powell*, 433 F.3d 889, 902 (D.C. Cir. 2006) ("[P]ublic humiliation, or loss of reputation, are not adverse actions."); *cf. Neuren v. Adduci, Mastriani, Meeks & Schill,* 43 F.3d 1507, 1514 (D.C. Cir. 1995) ("Although th[e] pejorative term [bitch] may support an inference that an employment decision is discriminatory under different circumstances, in itself, the term is not always conclusive of sex discrimination.").  Because Plaintiff's exhausted claim rests solely on Sergeant Muller's insulting language, she cannot establish a *prima facie* case of gender discrimination and the court will grant Defendant summary judgment.

## C.  Hostile Work Environment

To prevail on a hostile work environment claim, a plaintiff must show that his employer subjected him to "'discriminatory intimidation, ridicule, and insult' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'"  *Durant v. D.C. Gov't*, 875 F.3d 685, 700 (D.C. Cir. 2017) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)).  Courts consider "the totality of the circumstances, including the frequency of the discriminatory conduct, its severity, its offensiveness, and whether it interferes with an employee's work performance."  *Baloch v. Kempthorne*, 550 F.3d 1191, 1201 (D.C. Cir. 2008).  A hostile work environment claim "is viable only if the conduct of which Plaintiff complains is so 'extreme to amount to a change in the terms and conditions of employment.'"  *Jackson v. Gallaudet Univ.*, 169 F. Supp. 3d 1, 5 (D.D.C. 2016) (quoting *George*,

407 F. 3d at 416).  The inquiry is "both subjective and objective"—a plaintiff must "subjectively perceive the environment to be abusive" and the conduct must be "severe or pervasive enough to create an objectively hostile or abusive work environment."  *Moore v. Carson*, 322 F. Supp. 3d 163, 169 (D.D.C. 2018) (citation omitted).  Finally, "the plaintiff must also show 'some connection between the alleged abuse and the plaintiff's protected status.'"  *Id.* (quoting *Golden v. Mgmt. & Training Corp.*, 266 F. Supp. 3d 277, 286 (D.D.C. 2017)).  Courts are cautioned that Title VII is not "a general civility code" and courts should not participate in policing "the ordinary tribulations of the workplace."  *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (citation omitted).

There is no genuine dispute as to any material fact underlying Plaintiff's hostile work environment claim.  Defendant either agrees with or does not respond to Plaintiff's evidence.  *See Winston & Strawn, LLP v. McLean*, 843 F.3d 503, 507–08 (D.C. Cir. 2016) (holding that failing to respond to evidence at the summary judgment stage can only mean that such is undisputed, not conceded).  Plaintiff repeatedly classifies facts as disputed, but the purported disputes rest on legal conclusions, *see, e.g.*, Pl.'s SOF Resp. ¶¶ 44–49 (disputing materiality of facts); *id.* ¶ 76 (disputing that May 2013 Dereliction was "discriminatory"), *id.* ¶ 79 (disputing that her lower performance evaluation was deserved "because the derelictions were retaliatory"); supplement but do not dispute Defendant's evidence, *see, e.g., id.* ¶¶ 61–63 (disputing characterization of Plaintiff's handling of Variance 9 cases because she "*also*" raised issues regarding her administrative rights and the cases "had not been worked on by other detectives" during Plaintiff's FMLA leave) or lack a factual basis in the record, *see* Pl.'s Opp'n at ¶ 69 (contending "there is no record of any other similarly situated detective at WMATA having their cases reassigned" based on deponent's statement that "it is common in CID to have cases reassigned," but being unaware of specific

reassignments).  "Conclusory assertions offered without any factual basis cannot create a genuine dispute sufficient to survive summary judgment."  *Ferguson*, 630 F. Supp. 3d at 109.

Unlike disparate treatment and retaliation claims, hostile work environment claims do not rest on a single act occurring on a particular day.  *Morgan*, 536 U.S. at 115.  Rather, a collection of "separate acts" taken together may "constitute one 'unlawful employment practice.'"  *Id.* at 117 (citations omitted).  As a result, exhaustion requirements are "less stringent for hostile work environment claims than for discrete claims of discrimination or retaliation."  *Ferguson*, 630 F. Supp. 3d at 115 (quoting *Na'im v. Rice*, 577 F. Supp. 2d 361, 372 (D.D.C. 2008)).  "Provided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile work environment may be considered by a court for the purposes of determining liability."  *Baird v. Gotbaum*, 662 F.3d 1246, 1251 (D.C. Cir. 2011) (quoting *Singletary v. District of Columbia*, 351 F.3d 519, 526–27 (D.C. Cir. 2003)).  Hostile work environment claims are not "an open sesame to recovery for time-barred violations," however.  *Id.*  A plaintiff may raise untimely allegations "as 'part of the same actionable hostile work environment claim' only if they are adequately linked into a coherent hostile work environment claim—if, for example, they 'involve[] the same type of employment actions, occur[] relatively frequently, and [are] perpetrated by the same managers.'"  *Id.* (quoting *Morgan*, 536 U.S. at 120–21).

Plaintiff's Amended First EEOC Charge, which added the hostile work environment claim, alleges that Sergeant Muller referred to her and another female detectives as "bitches" and that Sergeant Muller "treated her differently" than other male detectives.  Pl.'s Amended First EEOC Charge at 4.[3]  Initially, Plaintiff adequately links those allegations to other events contributing to

---

[3] Under EEOC regulations, Plaintiff's First Amended EEOC Charge relates back to the original charge.  29 C.F.R. § 1601.12(b) ("[A]mendments alleging additional acts which constitute

a hostile work environment. Other officers at WMATA used the term "bitches" to refer to women. Alvarez Dep. at 33:08–21. On "[m]ultiple occasions," Sergeant Muller asked Plaintiff if her leave request was for "sexy time or shopping." Pl.'s Watkins Dep. at 195:02–17. Sergeant Muller denied Plaintiff's request for leave and overtime pay on "several occasions." *Id.* at 80:11–83:06, 195:18–21. Once, Sergeant Muller "yelled" and cursed at Plaintiff when she submitted her overtime slip. *Id.* at 80:16–21. And, when officers learned about Plaintiff's EEO charge against Muller, they commented that she would not get backup or that she would get "Swiss cheesed," meaning "fill[ed] with bullet holes." *Id.* at 203:21–206:02. These allegations involve identifiable common factors—Sergeant Muller and derogatory language.

After Sergeant Muller left CID, however, the connections are murkier or nonexistent. Plaintiff lumps together as part of her hostile work environment claim (1) the October 2012 Dereliction, (2) the December 2012 CAP, (3) the December 2012 Pay Grade Change; (4) the May 2013 Failure to Respond Dereliction, (5) the May 2013 Tardy Dereliction, (6) case reassignments, (7) the 2013 Performance Evaluation, and (8) the November 2013 Dereliction. Pl's Opp'n at 31–32. Courts "frown on plaintiffs who attempt to bootstrap" disparate acts of discrimination into a hostile work environment, and a "plaintiff cannot cure his failure to timely exhaust his complaints about these incidents by sweeping them under the rubric of a hostile work environment claim." *Dudley*, 924 F. Supp. 2d at 164 (cleaned up) (collecting cases). Sergeant Muller played no role in these later events, which involved several different supervisors and decisionmakers in CID's chain of command. Plaintiff also does not claim that any of the individuals responsible for these events

---

unlawful employment practices related to or growing out of the subject matter of the original charge will relate back to the date the charge was first received.").

used derogatory language, yelled at, or insulted her—during the specific incidents or at any other time.

Even if the court considered these discrete acts, "courts have generally rejected [] work related actions by supervisors as the basis of hostile work environment claims." *Ferguson*, 630 F. Supp. 3d at 116 (cleaned up) (collecting cases). For instance, the D.C. Circuit has determined that "selective enforcement of a time and attendance policy does not necessarily indicate conduct giving rise to a hostile work environment claim," "performance reviews also do little to evince abusive conditions" if "they were not uniformly negative and had some legitimate bases," and criticism with "recommended areas of improvement" is "hardly the stuff of severe or pervasive workplace hostility." *Brooks v. Grundmann*, 748 F.3d 1273, 1276–77 (D.C. Cir. 2014); *see also Durant*, 875 F.3d at 700 (Disciplinary actions taken "to address [Plaintiff's] deficient work performance" did not support hostile work environment claim); *Nurriddin v. Bolden*, 674 F. Supp. 2d 64, 94 (D.D.C. 2009) ("Nor can the removal of important assignments, lowered performance evaluations, and close scrutiny of assignments by management be characterized as sufficiently intimidating or offensive in an ordinary workplace context."); *Houston v. SecTek, Inc.*, 680 F. Supp. 2d 215, 225 (D.D.C. 2010) ("Allegations of undesirable job assignments or modified job functions . . . are not sufficient to establish that [Plaintiff's] work environment was permeated with discriminatory intimidation, ridicule, and insult." (citation omitted)).

Consequently, Sergeant Muller's derogatory language and alleged threats by other officers form the crux of Plaintiff's hostile work environment claim. Although such behavior is inappropriate for the workplace, the evidence merely reflects "sporadic use of abusive language, gender-related jokes, and occasional teasing" which does not amount to actionable harassment under Title VII. *Faragher*, 524 U.S. at 788 (citation omitted); *see also Stewart v. Evans*, 275 F.3d

1126, 1134 (D.C. Cir. 2002) ("[A] few isolated incidents of offensive conduct do not amount to actionable harassment.").  Moreover, most of the disparaging comments and insults occurred outside of Plaintiff's presence or were not directed at her.  *Bergbauer v. Mabus*, 934 F. Supp. 2d 55, 91 (D.D.C. 2013) ("Comments made outside of the employee's presence are generally not actionable as the basis for a hostile work environment claim."); *see also Burton v. District of Columbia*, 153 F. Supp. 3d 13, 87 (D.D.C. 2015) ("Incidents involving only statements made by third parties to third parties, and not directed to the plaintiff, are generally considered too attenuated to support an inference that the plaintiff was subjected to a hostile work environment."); *Nurriddin v. Goldin*, 382 F. Supp. 2d 79, 108 (D.D.C. 2005) ("When racial statements are not made directly to a plaintiff, generally a hostile environment cannot be established.").  And Sergeant Muller's isolated comments and yelling do not reflect "'discriminatory intimidation, ridicule, and insult' that is 'sufficiently severe or pervasive.'"  *Durant*, 875 F.3d at 700 (quoting *Harris*, 510 U.S. at 21).  Plaintiff alleges that one time Sergeant Muller yelled at her and used an expletive when she submitted her overtime request.  Pl.'s Watkins Dep. at 80:16–21.  That "incident, at its worst, was an isolated expression of frustration."  *See Brooks*, 748 F.3d at 1277.  The remaining comments "may have been tactless and ill-mannered," but "cannot rise to the level of severity indicating hostility or abuse*." Id.*  The D.C. Circuit and courts in this district have found significantly more serious conduct insufficient to support a hostile work environment claim.  *See, e.g., id.* at 1275, 1277 (Supervisor "yelling at [plaintiff] in front of co-workers, insulting and demeaning her, and flinging a heavy notebook which [plaintiff] thought was aimed in her direction" "cannot rise to the level of severity indicating hostility or abuse."); *Bergbauer*, 934 F. Supp. 2d at 91 (finding "[u]nspecified compliments about her looks, comments that could be seen as romantically or sexually suggestive, and a crass, sexually explicit joke" were not "sufficiently

'severe or pervasive' to alter the conditions of plaintiff's employment"); *id.* ("[A] general atmosphere of retribution, including rumors and audible expletives from co-workers would not support her claim." (citation omitted)); *Grosdidier v. Chairman, Broad. Bd. of Governors*, 774 F. Supp. 2d 76, 110–11 (D.D.C. 2011) ("[E]xcessive hugging and kissing and inappropriate use of terms such as 'master' or Sexy Papa' . . . is not severe or pervasive enough . . . .").

Finally, Plaintiff's contemporaneous statements undercut her claim. In May 2012, during the period of Sergeant Muller's problematic behavior, Plaintiff emailed OIG and OPRI representatives after her interview, stating: "When asked about a hostile work environment, I explained that though there may not be a hostile work environment per se, there is not a peaceful work environment in CID." Def.'s Watkins Dep. – Ex. 1 at 4, ECF No. 48-2. By her own admission, Plaintiff did not "subjectively perceive the environment to be abusive" at the time. *Moore*, 322 F. Supp. 3d at 169.

The court will therefore grant Defendant summary judgment on Plaintiff's hostile work environment claim because there is no genuine dispute of material fact and the record does not present sufficiently severe or pervasive conduct to support that claim.

## D. **Retaliation**

Title VII's antiretaliation provision prohibits an employer from retaliating against an individual because they "opposed any practice made an unlawful employment practice by [Title VII]" or "made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]." 42 U.S.C. § 2000e-3(a); *see Morris v. McCarthy*, 825 F.3d 658, 673 (D.C. Cir. 2016) (discussing scope of protected activity under Title VII). The parties agree that Plaintiff engaged in protected activity when she submitted her First EEOC Charge on August 13, 2012. Pl.'s SOF Resp. ¶¶ 113–14. Plaintiff argues that Defendant retaliated against her from October 2012 through March 2014, specifically, based on (1) the October 2012

Dereliction, (2) the December 2012 CAP, (3) the December 2012 Pay Grade Change, (4) the May 2013 Tardy Dereliction, (5) the May 2013 Failure to Respond Dereliction, (6) the 2013 Performance Evaluation, (6) the November 2013 Dereliction, (7) the evening rotation requirements change, (8) reassignment of her cases, (9) revocation of her outside employment authorization, and (10) the March 2014 Dereliction and Suspension.  Pl.'s Opp'n at 27–30.

i.  **Exhaustion**

Title VII's exhaustion requirements for discrete discriminatory acts similarly apply to discrete retaliatory acts.  *See Morgan*, 536 U.S. at 110–15; *see supra* Section B.i.  A plaintiff generally must file a charge with the EEOC within 180 days of the alleged unlawful employment practice.  42 U.S.C. § 2000e-5(e)(1).  "[E]ach retaliatory adverse employment decision constitutes a separate actionable 'unlawful employment practice'" and "only incidents that took place within the timely filing period are actionable."  *Morgan*, 536 U.S. at 114.  A plaintiff "must exhaust the administrative process regardless of any relationship that may exist between those discrete claims and any others."  *Rashad*, 945 F. Supp. 2d at 166 (quoting *Coleman-Adebayo*, 326 F. Supp. 2d at 137–38, and collecting cases).

Defendant argues that Plaintiff failed to exhaust the October 2012 Dereliction, the May 2013 Tardy Dereliction, and the May 2013 Failure to Respond Dereliction.  Def.'s MSJ at 11, 15–16.  There is a dispute as to when Plaintiff filed her Second EEOC Charge.  The parties provided three versions of that charge.  Defendant's copy is unsigned and undated but attached to an EEOC charge notice dated July 3, 2013.  Def.'s Second EEOC Charge.  Plaintiff attached two copies, one dated April 1, 2013 and another May 28, 2013.  Pl.'s Second EEOC Charges at 8–10.  The date stamps are illegible.  *Id.*  If Plaintiff filed the charge on April 1, 2013, she timely exhausted discrete retaliatory acts raised in the charge that occurred on or after October 3, 2012, which would encompass the October 2012 Dereliction.  Boehm Decl. – Ex. 3 (dereliction occurring on October

12, 2012).  If she filed the charge on May 28, 2013, she solely exhausted discrete retaliatory acts occurring on or after November 29, 2012, rendering the October 2012 Dereliction unexhausted. Because the parties dispute the correct date and Plaintiff's evidence "presents a sufficient disagreement," *Anderson*, 477 U.S. at 251–52, the court will not grant Defendant summary judgment on exhaustion grounds for the October 2012 Dereliction.

For the May 2013 Tardy Dereliction and May 2013 Failure to Respond Dereliction, Defendant argues that Plaintiff's Second Amended EEOC Charge, filed on January 2, 2014, does not relate back to the original Second EEOC Charge.  Def.'s MSJ at 15–16.  Pursuant to EEOC regulations, a "charge may be amended to cure technical defects or omissions, including failure to verify the charge, or to clarify and amplify allegations."  29 C.F.R. § 1601.12(b).  "[A]mendments alleging additional acts which constitute unlawful employment practices related to or growing out of the subject matter of the original charge will relate back to the date the charge was first received."  *Id.*  Defendant does not dispute that Plaintiff's Amended Second EEOC Charge timely exhausted discrete retaliatory acts occurring within 180 days of the amendment, meaning acts occurring on or after July 6, 2013, but argues that it does not encompass the May 2013 derelictions. Def.'s MSJ at 15–16.  Courts refuse to consider charges raising new substantive theories as related to or growing out of the subject matter of the original charge, *Scott v. Dist. Hospital Partners, L.P.*, 60 F. Supp. 3d 156, 163 (D.D.C. 2014) (collecting cases), but permit relation back when plaintiffs describe "'ongoing' retaliation" and the subsequent retaliatory acts are similar in kind to those raised in the earlier charge.  *Border v. Nat'l Real Estate Advisors, LLC*, 453 F. Supp. 3d 249, 258 (D.D.C. 2020); *Elzeneiny v. District of Columbia*, 195 F. Supp. 3d 207, 228 (D.D.C. 2016). Plaintiff's Second EEOC Charge alleged a "continuing action" and an "undeserved disciplinary report (a dereliction)."  Pl.'s Second EEOC Charges at 9–10.  The subsequent derelictions in May

2013 sufficiently "grow[] out of the subject matter of the original charge." 29 C.F.R. § 1601.12(b).

Therefore, Plaintiff's Second EEOC Charge, filed in April or May 2013 and amended on January

2, 2014, timely exhausted any discrete retaliatory acts raised in the charges occurring between

October 3, 2012 and January 2, 2014.

    ii.   **Merits**

       The *McDonnell Douglas* burden shifting framework applies to Title VII retaliation claims.

*Jones v. Bernanke*, 557 F.3d 670, 677 (D.C. Cir. 2009). Under that framework, a plaintiff must

first establish a *prima facie* case of retaliation by showing: (1) that she engaged in statutorily

protected activity; (2) that she suffered a materially adverse action by her employer; and (3) that a

causal link connects the two. *Id.* Once the *prima facie* case is established, the burden shifts to the

defendant to provide "a legitimate, nondiscriminatory [or non-retaliatory] reason" for its actions.

*Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000) (citation omitted). At that

point, the *McDonnell Douglas* framework "disappear[s]," *id.* at 142–43, and the court's inquiry is

whether "a reasonable jury could find that the defendant's proffered reasons are pretextual and that

the real impetus for the adverse action was discriminatory or retaliatory animus." *Salak v. Pruitt*,

277 F. Supp. 3d 11, 21–22 (D.D.C. 2017) (citing *Brady v. Off. of Sergeant at Arms*, 520 F.3d 490,

494 (D.C. Cir. 2008), and *Morgan v. Fed. Home Loan Mortg. Corp.*, 328 F.3d 647, 654 (D.C. Cir.

2003)).

       Defendant has asserted a legitimate, non-retaliatory reason for its actions for each

purported retaliatory act. Sworn depositions, declarations, and documentary evidence satisfy a

defendant's burden "to produce admissible evidence that, if believed, would establish that [its]

action was motivated by legitimate, nondiscriminatory reason." *Royall v. Nat'l Ass'n of Letter

Carriers, AFL-CIO*, 548 F.3d 137, 144–45 (D.C. Cir. 2008) (quoting *Teneyck v. Omni Shoreham

Hotel*, 365 F.3d 1139, 1151 (D.C. Cir. 2004)). Defendant provided MTPD's governing policies

and procedures, sworn declarations and contemporary reports detailing Plaintiff's violations of those procedures, and subsequent discipline. *See generally* Boehm Decl. & Exs.; Alvarez Decl. & Exs. The derelictions, investigation reports, memoranda regarding revocation of Plaintiff's work authorization, and letter regarding the December 2012 Pay Grade Change each identify the relevant facts and the MTPD General Order justifying the challenged action.[4]  Plaintiff received a lower performance evaluation score in 2013, which nonetheless remained in the acceptable range, because of the derelictions.  Alvarez Decl. ¶¶ 53–54; Pl.'s Opp'n – Ex. 2, ECF No. 50-22. Plaintiff's deposition testimony confirms that the change to evening rotations was a uniform policy change; she testified that Defendant made the evening shift rotation "mandatory for all of the detectives in the Landover CID office."  Pl.'s Watkins Dep. at 215:21–22.  Finally, declarations or deposition testimony confirmed that "it is common in CID to have cases reassigned," Alvarez Dep. 116:10–11, and cases would be "assigned and reassigned to detectives with the goal of efficiency in getting cases investigated and closed promptly."  Alvarez Decl. ¶ 16.

Defendant's assessments of Plaintiff's performance and documented grounds for discipline based on uniform policies constitute legitimate, non-retaliatory reasons. *See, e.g.*, *Jones*, 557 F.3d at 678 (finding defendant asserted a legitimate non-retaliatory explanation for the performance "evaluation—that it reflected an honest assessment of Jones's performance"); *Royall*, 548 F.3d at

---

[4] Boehm Decl. – Ex. 3 (identifying MTPD General Order 215.II, as justifying the October 2012 Dereliction); Boehm Decl. – Ex. 4 (identifying MTPD General Order 215.II, as justifying the CAP); Alvarez Decl. – Ex. 17 (identifying MTPD General Order 244.III.F as justifying the December 2012 Pay Grade Change); Alvarez Decl. – Ex. 22 (identifying MTPD General Order 215.III.F & G and General Order 405.V.F, as justifying the May 2013 Failure to Respond Dereliction); Alvarez Decl. – Ex. 23 (identifying MTPD General Order 200.230.II, as justifying the May 2013 Tardy Dereliction); Alvarez Decl. – Ex. 24 (identifying MTPD General Order 255.IV.L3 as justifying the November 2013 Dereliction); Boehm Decl. – Exs. 5 & 6 (identifying MTPD General Order 245 as justifying the revocation of Plaintiff's work authorization); Boehm Decl. – Ex. 8 (identifying CID Case Management SOP and MTPD General Order 217.III.A.4 as justifying the March 2014 Dereliction).

144 (finding "a steady drumbeat of complaints about [plaintiff's] job performance" articulated a legitimate nondiscriminatory justification); *Dodson v. U.S. Capitol Police*, 633 F. Supp. 3d 235, 253 (D.D.C. 2022) (finding defendant asserted a non-discriminatory reason for Plaintiff's discipline and termination because plaintiff "failed to obey his supervisor's command to work" a particular shift and "failed to report to work on two of his scheduled workdays").

Once the employer asserts a legitimate, non-retaliatory reason for its decision, the "central inquiry in deciding an employer's motion for summary judgment [is] whether the plaintiff produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory and non-retaliatory reason was not the actual reason and that the employer intentionally discriminated or retaliated against the plaintiff on a prohibited basis." *Oviedo v. Wash. Metro. Area Transit Auth.*, 948 F.3d 386, 396 (D.C. Cir. 2020) (quoting *Iyoha v. Architect of the Cap.*, 927 F.3d 561, 566 (D.C. Cir. 2019)) (cleaned up). A plaintiff "must proffer evidence sufficient to 'create[] a material dispute on the ultimate issue of retaliation." *Dodson v. U.S. Cap. Police*, 633 F. Supp. 3d 235, 262 (D.D.C. 2022) (quoting *Jones*, 557 .3d at 678). "A plaintiff need not present evidence 'over and above rebutting the employer's stated explanation,'" but "must present evidence from which a reasonable jury 'could reject the employer's proffered explanation.'" *Oviedo*, 948 F.3d at 566 (quoting *Aka v. Wash. Hosp. Ctr.*, 156 F.3d 1284, 1290 (D.C. Cir. 1998) (en banc)). "[A] plaintiff will not survive summary judgment 'where the plaintiff created only a weak issue of fact as to whether the employer's reason [for the termination] was untrue and there [is] abundant and uncontroverted independent evidence that no discrimination [has] occurred.'" *Id.* (quoting *Giles v. Transit Emps. Fed. Credit Union*, 794 F.3d 1, 13 (D.C. Cir. 2015) (alterations in original)).

Considering the entire summary judgment record, the court finds that Plaintiff has failed to produce sufficient evidence to create a material dispute on the ultimate issue of retaliation. She first urges the court to find sufficient evidence based on the temporal proximity. To be sure, a plaintiff may undermine an employer's proffered reason by showing that "the employer had knowledge of the employee's protected activity, and . . . [that] the adverse personnel action took place shortly after that activity." *Holcomb v. Powell*, 433 F.3d 889, 903 (D.C. Cir. 2006) (citation omitted). For most of Plaintiff's retaliation claims, the record contains sufficient evidence that the decisionmakers knew about her EEOC activity. Plaintiff's deposition testimony and documentary evidence permits an inference that Sergeant Page, Sergeant Clayton, Captain Gaddis, Lieutenant Hanna, Lieutenant Boehm, Chief Taborn, and Chief Pavlik knew of her EEOC activity. Bryant Decl. ¶ 10 (OEEO informed the MTPD Chief of EEOC charges); Pl.'s Watkins Dep. at 53:18–22 (stating Plaintiff discussed her EEOC activity with Sergeant Page); Def.'s Watkins Dep. – Ex. 1 at 1–2 (Email to Lieutenant Hanna regarding potential EEOC complaint); Def's Watkins Dep. Ex. 1 at 3–4 (Email to Captain Gaddis regarding recently filed EEOC complaint); Boehm Decl. ¶ 23 (Sergeant Clayton reported possible discrimination against Watkins to Lieutenant Boehm in October 2013). Those supervisors were the decisionmakers responsible for the challenged actions, with one exception—the May 2013 Tardy Dereliction. That dereliction was issued by Sergeant Moye at the Cheltenham, Maryland shooting range, where the annual handgun certification occurred, not by an officer within the CID chain of command. *See* Alvarez Decl. – Ex. 23; MSJ at 16. Plaintiff has pointed to no evidence showing that Sergeant Moye knew that she had engaged in protected activity. Accordingly, Defendant is entitled to summary judgment as to Plaintiff's retaliation claim based on the May 2013 Tardy Dereliction. *See Oviedo v. WMATA*, 299 F. Supp.

3d 50, 62–32 (D.D.C. 2018) (granting summary judgment because plaintiff produced no evidence

that decisionmaker "was aware, actually or constructively of Plaintiff's prior EEO activity").

Despite satisfying the knowledge requirement, Plaintiff's temporal proximity evidence

fails to defeat Defendant's legitimate, non-retaliatory explanation.  To permit an inference of

causation, temporal proximity between the protected activity and alleged retaliatory actions "must

be 'very close.'"  *Dodson*, 633 F. Supp. 3d at 263 (citation omitted).    Although courts in this

district "have often followed a three-month rule to establish causation on the basis of temporal

proximity alone," *id.* (citation modified), "neither the Supreme Court nor [the D.C. Circuit] has

established a bright-line three-month rule." *Hamilton v. Geithner*, 666 F.3d 1344, 1357–58 (D.C.

Cir. 2012).  Plaintiff contends that Defendant retaliated against her for submitting the informal

complaint against Sergeant Muller on April 18, 2012 and the First EEOC Charge on August 13,

2012.  Pl.'s Opp'n at 27–28.[5]  The first alleged incident of retaliation—the October 2012

Dereliction—occurred on October 11, 2012, *see* Boehm Decl. – Ex. 3, nearly six months after the

April 18 complaint and nearly two months after the First EEOC Charge.  The time gap between

Plaintiff's protected activity and the remaining challenged actions ranges from four months to two

years.  Although the earliest action falls within the three-month period, the increasingly large time

lapse does little to overcome Defendant's legitimate explanations.  *See, e.g.*, *Clark Cnty. Sch. Dist.*

*v. Breeden*, 532 U.S. 268, 273 (2001) ("Action taken [] 20 months later suggest, by itself, no

causality at all."); *Taylor v. Solis*, 571 F.3d 1313, 1322 (D.C. Cir. 2009) ("[A]n inference of

retaliatory motive based upon the 'mere proximity' in time" of "two and one-half months [] would

be untenable on the record") (collecting cases).  Plaintiff no longer appears to argue that Defendant

---

[5] Plaintiff does not argue that Defendants retaliated against her for filing the Second EEOC Charge
in April or May 2013, or the Second Amended EEOC Charge on January 2, 2014.

retaliated against her for amending her First EEOC Charge on February 5, 2013.  *See* Pl.'s Opp'n

at 27–28 (limiting her discussion to her April 2012 complaint and August 2012 EEOC Charge);

*id.* at 29 (arguing retaliation after "Plaintiff engaged in EEO activity in 2012").  Even if she did,

the temporal proximity between the amendment and the subsequent alleged retaliatory actions is

similarly unpersuasive.  Three months passed between the amendment and the next alleged

incident of retaliation—the May 2013 Failure to Respond Dereliction—and the lapse increases to

thirteen months by the last alleged retaliation—the March 2014 Dereliction and Suspension.

Even if the two- or three-month intervals permitted an inference of causation, that is not

alone enough to survive summary judgment.  *Iyoha*, 927 F.3d at 574.  "Once the employer proffers

a non-retaliatory explanation for the adverse employment action," "'positive evidence beyond

mere proximity is required to defeat the presumption that the proffered explanations [for the

adverse employment action] are genuine.'"  *Id.* (quoting *Woodruff v. Peters*, 482 F.3d 521, 529

(D.C. Cir. 2007)).

Plaintiff concedes that the MTPD General Orders contain policies and procedures

justifying Defendant's actions.  *See* Pl.'s SOF Resp. ¶ 43 (not disputing MTPD General Order 244

contains the pay criteria for PO2 and PO3 status, including the sick leave balance requirements);

*id.* ¶ 82 (not disputing MTPD General Order 245 requires a sick leave balance of 100 hours to be

eligible for outside employment); *id.* ¶ 89 (not disputing that "General Order 255 refers to failure

to notify an official before returning from leave as a violation").  But she argues that Defendant

used the MTPD General Orders as a pretext for retaliation.  The "most commonly employed

method" of demonstrating pretext is establishing that "similarly situated persons . . . received more

favorable treatment."  *Huckstep v. Wash. Metro. Area Transit Auth.*, 216 F. Supp. 3d 69, 78

(D.D.C. 2016) (quoting 1 Lex. K. Larson, *Employment Discrimination* § 8.04, at 8-66 (2d ed.

2007)). To prove that another employee is similarly situated, Plaintiff must show that she and the other employee were "charged with offenses of comparable seriousness" and that "all of the relevant aspects of [her] employment situation were nearly identical to those of the other employees." *Wheeler v. Georgetown Univ. Hosp.*, 812 F.3d 1109, 1116 (D.C. Cir. 2016) (quoting *Burley v. Nat'l Passenger Rail Corp.,* 801 F.3d 290, 301 (D.C. Cir. 2015)). "Factors that bear on whether someone is an appropriate comparator include the similarity of the plaintiff's and the putative comparator's jobs and job duties, whether they were disciplined by the same supervisor, and, in cases involving discipline, the similarity of their offenses." *Id.* (citation omitted).

Plaintiff identifies purportedly similarly situated employees for some of the challenged actions but does not show those individuals are appropriate comparators. For instance, Plaintiff claims similarly situated employees, C.A. and J.M., were not put on a CAP in connection with Variance 9 investigations, Pl.'s Opp'n ¶¶ 78, 96; a "similarly situated male detective, D.R., did not receive a suspension for not responding to a radio call," *id.* ¶ 99; and "a similarly situated male detective, J.D." did not receive a dereliction for failing to call in, *id.* ¶¶ 67, 69. The record reflects that C.A. and J.M. were MTPD detectives, Pl.'s Ex. 12 at 3, ECF No. 50-14, and that D.R. and J.D. were Plaintiff's "assigned partners," Pl.'s Opp'n ¶ 9. Even if the court assumes purely from their positions that those individuals had the same job duties and supervisors as Plaintiff, there is no evidence that they "committed offenses of comparable seriousness." *Burley*, 801 F.3d at 302. Plaintiff points to evidence that the individuals did not receive a CAP or dereliction but there is no evidence that they committed an offense warranting a CAP or dereliction.

For C.A. and J.M., Plaintiff relies on her deposition that she "believe[d] . . . [C.A.] was assigned some of the Variance 9," but she did not know whether he was given a specific deadline for the cases, Pl.'s Watkins Dep. at 129:07–20, Alvarez's deposition testimony that he was not

"aware of" J.M. receiving a CAP, Alvarez Dep. at 114:07–14; and Defendant's interrogatory response that "it is not aware of other Detectives put on a [CAP] by Sgt. Clayton," Pl.'s Ex. 4, ECF No. 50-6.  First, there is no evidence that J.M. worked on Variance 9 investigations.  And even if he did, there is nothing in the record demonstrating that either J.M. or C.A. failed to complete their Variance 9 investigations in a timely manner.  For D.R., Plaintiff points to an exchange during Alvarez's deposition in which Plaintiff's counsel asked whether D.R. received a suspension for not responding and Alavarez responded that D.R. did not, Alvarez Dep. at 115:06–16, but Plaintiff's counsel failed to lay any foundation for the inquiry, meaning there is no evidence that D.R. did not respond to a radio call.  The court cannot find that he deserved a suspension without any indication that he committed the underlying infraction.  Finally, as to J.D., Plaintiff relies on Alvarez's testimony that he was "not aware of" J.D. failing to call in before returning from sick leave.  Alvarez Dep. at 115:06–16.  The court cannot conclude that Plaintiff and any of these employees are similarly situated from this evidence.  Because the record lacks any basis to conclude the other employees "committed offenses of comparable seriousness," *Burley*, 801 F.3d at 302, they are not appropriate comparators.  *See Huckstep*, 216 F. Supp. 3d at 81 (holding individuals in similar positions and disciplined by the same supervisor "are still not appropriate comparators because neither . . . was involved in an accident 'of comparable seriousness' to [Plaintiff's] accident. (citations omitted)).

For the December 2012 Pay Grade Change, Plaintiff provides a modicum of further detail on the comparator's offense and treatment.  She argues that a similarly situated employee without prior EEOC activity (M.B.) was permitted to remain at the PO2 pay grade and subsequently returned to the PO3 pay grade, even though he lacked the requisite sick leave balance.  Pl.'s SOF Resp. ¶¶ 52–54.  Defendant concedes that M.B. was granted a waiver, Def.'s SOF ¶¶ 52–54, but

Plaintiff provides no evidence showing she and M.B. were similarly situated. Whereas Defendant provides a sworn declaration that M.B. "served as an officer in the Patrol Operations Bureau during and prior to 2012 and was at no time a detective in the MTPD's Criminal Investigation Division." Second Alvarez Decl. ¶ 10, ECF No. 52-3. Furthermore, Defendant identified "15 other MTPD officers" whose pay grade was reduced at the same time as Plaintiff's, Def.'s SOF ¶ 52, and the ten male officers subject to that pay reduction "had no record of complaints of discrimination," Def.'s Supp. SOF ¶ 4, which bolsters Defendant's legitimate, non-retaliatory reason for changing Plaintiff's pay grade.

As to the remaining challenged actions, Plaintiff merely makes conclusory statements, undermined by her own evidence. She asserts that she and another detective who engaged in EEO activity "were the only detectives forced and mandated to work the evening rotation," Pl.'s Opp'n ¶ 48, but her deposition testimony reflects the exact opposite—CID "made [the evening rotation] mandatory for all of the detectives in the Landover CID office," Pl.'s Watkins Dep. at 215:21–22. She also claims "there is no record of any other similarly situated detective at WMATA having their cases reassigned," Pl.'s Opp'n ¶ 108, citing Alvarez's deposition that he was "not aware" if Plaintiff's coworkers had cases reassigned but that "it is common in CID to have cases reassigned." Alvarez Dep. at 116:10–11. She also testified that another detective's Variance 9 cases "were eventually moved to [her]," Pl.'s Watkins Dep. at 129:07–20, indicating that at least one other detective had their cases reassigned.

On this record, no reasonable jury could find that Defendant's stated reasons for the challenged actions were pretextual. The court will therefore grant Defendant's motion for summary judgment on Count III.

## IV.    CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment will be GRANTED.


Date: August 15, 2025

*Tanya S. Chutkan*
_____
TANYA S. CHUTKAN
United States District Judge
